No. 123,086

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CATHERINE A. JORITZ,
*Appellant*,

v.

UNIVERSITY OF KANSAS,
*Appellee*.

SYLLABUS BY THE COURT

1.

Under federal caselaw, pro se litigants' pleadings are held to less stringent standards than formal pleadings drafted by lawyers.

2.

Under Kansas caselaw and rules, pro se litigants in a civil case are required to follow the same rules of procedure and evidence which are binding upon litigants who are represented by counsel. Pro se litigants in civil litigation cannot expect the trial judge or an attorney for the other party to advise them of the law or court rules, or to see that their case is properly presented to the court. Pro se litigants in a civil case cannot be given either an advantage or a disadvantage solely because of proceeding pro se.

1

Appeal from Douglas District Court; JAMES R. MCCABRIA, judge. Opinion filed January 21, 2022. Affirmed.

*Catherine A. Joritz*, appellant pro se.

*Derek T. Teeter* and *Michael T. Raupp*, of Husch Blackwell LLP, of Kansas City, Missouri, for appellees.

Before BRUNS, P.J., GREEN and ISHERWOOD, JJ.

GREEN, J.: Catherine A. Joritz appeals the district court's denial of her petition for judicial review filed under the Kansas Judicial Review Act (KJRA), in which she alleged that the University of Kansas wrongly terminated her tenure track employment. On appeal, Joritz asserts that the University violated its rules for evaluating a tenure candidate's progress toward tenure before terminating her tenure track employment for inadequate progress toward tenure. Based on this, she contends that in denying her petition for judicial review, the district court ignored the University's violations, made multiple errors of law, and made an error of fact. She also contends that the district judge who denied her petition for judicial review committed judicial misconduct. The University responds that there are procedural problems with Joritz' arguments and that Joritz' arguments are baseless.

Joritz has taken a scattershot approach to making her arguments in her briefs. Regardless of Joritz' pro se status, it is not our job to piece together Joritz' scattered and improperly raised arguments in her briefs. As the Seventh Circuit Court of Appeals persuasively pointed out when discussing appellants who include sequences of unreasoned arguments in their briefs, the court appropriately stated: "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Judges should not have to scour an appellant's briefs or the record on appeal to understand the appellant's arguments. *Estate of Moreland v. Dieter*, 395 F.3d

2

747, 759 (7th Cir. 2005). Instead, "[a] brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record." *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999). That responsibility falls to the advocates "to make it easy for the court to rule in [their] favor." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir 2006).

Joritz is not entitled to special treatment as a pro se appellant. Kansas caselaw establishes that Joritz' pro se status entitles her only to the liberal construction of arguments that are properly before us. Accordingly, she cannot avoid complying with appellate procedure because she is pro se. For if she were allowed to do so, she would gain an unfair advantage over the University because it has argued in its brief that these procedural deficits in her brief should be one of the grounds for affirming the district court's decision. For reasons set forth later, we affirm the district court's denial of Joritz' petition for judicial review.

FACTS

The University hired Joritz as an assistant professor in the Film and Media Studies (FMS) Department in 2012. Her job as an assistant professor was a tenure track position.

Before the University hired Joritz, she had worked in the film industry, specializing in animation, for many years. Also, before the University hired Joritz, she had emigrated to Germany, living there for many years. Once at the University, Joritz continued her work in animation. In addition to teaching FMS courses, some on animation, Joritz started researching Lotte Reiniger; Reiniger was a 20th century German silhouette animator, whom Joritz intended to write a book about. Significantly, Joritz' research on Reiniger was part of her efforts to obtain tenure at the University.

3

*A Review of the Relevant Agency Rules*

Under the FMS Department's rules on Promotion and Tenure Procedure and the University's Faculty and Senate Rules and Regulations, a tenure candidate must undergo an initial review, commonly called a Progress Toward Tenure Review (PTTR), of the candidate's teaching, service, and research work before the candidate applies for tenure. For a FMS Department tenure candidate specifically, the FMS Department's rules state that a candidate seeking tenure status is "expected to engage in scholarly and/or creative research." Concerning books, the rules explain that "[s]cholarly books and monographs shall be considered important evidence of research capability." But the rules further state: "Scholarship that merits tenure is defined as a researched or creative monograph, or a combination of published articles, edited books, or research-based textbooks equivalent to a monograph in quantity and quality."

As for the FMS Department's review procedures, the FMS Department's Initial Review Committee (IRC) completes the PTTR. In doing so, the IRC evaluates a tenure candidate's efforts in teaching, service, and research based, in part, on the candidate's dossier, which details the candidate's historical work and University work as an assistant professor. Also, during the PTTR process, the IRC "shall" seek the opinions of "outside reviewers," including faculty and students, about the candidate's qualifications. Yet, in completing the tenure candidate's PTTR, the candidate's efforts in teaching, service, and research are not given the same weight. An FMS Department's tenure candidate's teaching evaluation constitutes 40% of the candidate's review. The candidate's research evaluation constitutes 40% of the candidate's review, while the candidate's service evaluation constitutes 20% of the candidate's review.

In the end, the IRC rates a tenure candidate's performance in teaching, service, and research as excellent, very good, good, marginal, or poor before making a recommendation—by simple majority—whether the candidate has made enough progress

4

toward tenure to continue the candidate's tenure track employment. After doing this, the IRC forwards its recommendation to the FMS Department's committee as a whole, which does not vote on the rating of performance, but only on a recommendation of whether the candidate should continue their tenure track employment. The committee as a whole prepares the PTTR candidate's evaluation form before forwarding it to the FMS Department Chair. The Chair must then "indicate separately, in writing, whether he or she concurs or disagrees with the recommendations of the committee of the whole." And after this, the FMS Department Chair should notify the candidate of the IRC's recommendation.

When the IRC gives a tenure candidate a favorable recommendation, that recommendation is automatically forwarded to the College of Liberal Arts and Sciences' College Committee on Appointments, Promotion, and Tenure (CCAPT) for approval. The IRC also forwards its recommendations to the CCAPT (1) when the FMS Department Chair seeks further review of the IRC's favorable or unfavorable recommendation or (2) when the tenure candidate seeks review of the IRC's unfavorable recommendation. Regardless of why the CCAPT is reviewing the IRC's recommendation, the CCAPT engages in an independent review that neither affirms nor reverses the IRC's PTTR recommendations.

According to the College of Liberal Arts and Sciences' bylaws, during the CCAPT's review, the CCAPT must "[c]onsider all recommendations for advancement in academic rank and granting of continuous tenure for members of the College Faculty." Also, according to the College of Liberal Arts and Sciences' PTTR purpose statement, the purpose of CCAPT's review is "to determine whether departmental standards of evaluation and assessment of the individual are in line with those of the College and University promotion and tenure committees." In doing so, its "special concern" involves reviewing cases where it appears the department gave the tenure candidate a favorable review but the CCAPT "would [have] evaluate[d] the candidate more critically."

5

Ultimately, the CCAPT makes its own recommendation on whether a particular tenure candidate has made sufficient progress toward tenure, and it forwards this recommendation to the College of Liberal Arts and Sciences' Dean. After this, the Dean writes a letter to the tenure candidate's department chair, notifying the chair of the CCAPT's recommendation on the candidate's continued employment with the University. And after this, the department chair should notify the candidate of the CCAPT's decision.

When the CCAPT recommends termination of a candidate's tenure track employment, the Dean should also send the CCAPT's recommendation to the Provost. Upon receiving this letter, the College of Liberal Arts and Sciences' PTTR purpose statement provides that the Provost should notify the unsuccessful tenure candidate "in writing of the [CCAPT's] recommendation and the reasons for it" before forwarding this recommendation to the Chancellor for final agency action. In the Provost's letter, however, the Provost must also tell the unsuccessful tenure candidate about the right to appeal to the Faculty Rights Board (FRB).

Should an unsuccessful tenure candidate appeal to the FRB, the University's Faculty and Senate Rules and Regulations states that the candidate must prove that the CCAPT erred by recommending that the University terminate his or her tenure-track employment. Those rules further provide that during the unsuccessful tenure candidate's appeal, the FRB has a limited review:

> "The Function of the FRB in the promotion and tenure context is not to review the merits of promotion and tenure recommendations, nor to substitute its judgment on the merits, but rather to identify specifically defined appealable errors that undermine the evaluation process itself and to recommend appropriate accommodations or adjustments to the Chancellor for consideration in making the final promotion and tenure decision."

As indicated by the preceding rule, after the FRB engages in its limited review, it forwards its written recommendation to the Chancellor for final agency action. The rules

6

state that during the Chancellor's review, the Chancellor has access to the entire agency record, which includes "the recommendations of the initial, intermediate, and university level review." It also provides that in making the decision whether to terminate a candidate's tenure track employment, the Chancellor may consider any other "information" the Chancellor "deems appropriate." After doing this, the Chancellor decides whether to continue or terminate the candidate's tenure track employment before notifying the Provost of his or her decision. Then, the Provost must notify the candidate of the Chancellor's decision.

Because the Chancellor's decision is the final agency action, upon the Chancellor's decision, there are no more levels of administrative review. Thus, following the Chancellor's decision, dissatisfied unsuccessful tenure candidates must challenge their termination by suing the University under the KJRA.

*The University Terminates Joritz' Tenure Track Employment*

During the 2014-2015 academic year, which was Joritz' third year as an assistant professor in the FMS Department, Joritz' underwent her first PTTR. At that time, the FMS Department found that Joritz' record was "insufficient to demonstrate progress toward tenure in the areas of teaching and research." Also, although her service record was better than her teaching and research record, the FMS Department identified Joritz' service record as another "area of concern."

Because Joritz failed to prove sufficient progress toward tenure during her initial PTTR, the CCAPT "required [her] to undergo a subsequent probationary review" during the 2015-2016 academic year. When the CCAPT notified Joritz that she had failed her first PTTR, it told Joritz that she should "increase [her] service commitments on both the national and international level." Additionally, it told her that she would need to complete her important projects related to obtaining tenure—the book on Reiniger and a couple of

7

ongoing film projects, including *Film Feed*—at least one year in advance of her mandatory tenure review. Although not entirely clear from the record on appeal, based on Joritz' assertions, it seems that her mandatory tenure review year was during the 2018-2019 academic year.

In any case, during the 2015-2016 academic year, Joritz underwent another PTTR. In her dossier for this PTTR, Joritz stated that the projected completion for her book on Reiniger was 2019. Meanwhile, she stated that *Film Feed*'s projected finish was 2017.

At the FMS Department level, the IRC ultimately found that Joritz' had done enough during the past year in the areas of teaching, service, and research to demonstrate progress toward tenure. As a result, the IRC committee recommended that Joritz keep her tenure track employment with the University. In making its decision, the IRC outlined Joritz' recent efforts to improve her teaching. And it explained that Joritz' service was adequate.

As for her research, the IRC discussed Joritz' ongoing work on the Reiniger book and *Film Feed*. In doing so, it noted that in her dossier, Joritz had stated that she planned to complete her Reiniger book in 2019. It then provided the following explanation why Joritz' research work had demonstrated sufficient progress toward tenure during the past academic year:

> "The Committee recognizes the scope and number of projects [that Joritz] is engaged in, and to the extent that she can complete these and have them adjudicated in a timely manner, the Committee believes she 'Demonstrates progress toward tenure.' Many of [Professor] Joritz's creative and scholarly projects are the result of years of planning, and in some cases, she has masterfully incorporated her research into her animation production classes, as the silhouette animation by Reiniger exemplifies. Moreover, the Hall Center Creative Work Fellowship for 2016 should aid her in completing *Film [Feed]*, which she will send out for vetting and screenings at film festivals. We

8

understand that finishing a 2-minute piece such as *Film Feed* is extremely laborious and time consuming, and are encouraged that the Hall Center Fellowship will provide her the time required to bring the project to completion. If this piece and others come to fruition as publications and at juried festivals the Committee trusts that her publications, her presentations, and her outreach will grow her reputation and contribute to that of the University of Kansas and the Department of Film and Media Studies."

Still, the Chair of the FMS Department did not agree with the IRC's recommendation. As a result, upon completion of Joritz' second PTTR evaluation, the FMS Chair wrote the CCAPT a letter, explaining that he disagreed with the IRC's finding that Joritz' work demonstrated sufficient progress toward tenure. In this letter, although the FMS Chair agreed with the IRC's assessment on Joritz' teaching, he disagreed with the IRC's assessment on Joritz' service and research record. The FMS Chair's specific concern about Joritz' service record involved Joritz' treatment of others, which he alleged violated the University's rule about not engaging in activities that disrupt "*operations of the academic unit*." He alleged that the IRC "members recognized an ongoing pattern of disrespectful, combative, and disruptive behavior from [Joritz] directed towards other faculty, students, and staff as a topic of concern." But he alleged that when conducting her PTTR, the IRC disregarded Joritz' behavioral issues because it was "unsure as to how or whether the matter should be formally addressed."

On Joritz' research, the FMS Chair explained that he believed Joritz' research work was inadequate:

"In its deliberations, the Committee unanimously agreed that the quantity of [Joritz'] major works did not meet expectations and seemed to have advanced very little during her four years at [the University]. Some members, however, felt that recent progress made by [Joritz]—specifically, two public presentations and a non-peer reviewed review of a museum exhibit—indicated a trend of improvement. To reflect this plurality, the Committee considered 'Improvement Required for Continued Progress' but as that

9

category seemed to indicate a further—in this case, fifth year—review, the Committee settled on 'Demonstrates progress toward tenure.'

"In my own evaluation, however, I remain unconvinced that [Joritz'] record of accomplishments indicates a sustainable program of major scholarly activity. Specifically, there are several problems with the candidate's book project on Lotte Reiniger as it is presented. In terms of conception and organization, the candidate acknowledged to me last week that none of the manuscript has been written nor does she have a clear conception of the project's basic organization. She is still collecting materials and requires a greater grasp of the archival holdings before she can begin analysis of the data and formulate a book proposal. By her admission, a substantial portion of the Lotte Reiniger archive at the Stadtmuseum in Tubingen, Germany remains un-cataloged and unknown to her and *officials there have denied her requests for access to those materials*. Further, *she said even her access to the private collection of* [*G.M.*] *in Canada is becoming limited due to his declining mental and physical condition*. Questions of organization and access aside, considering [Joritz'] minimal record of scholarly publication to date, the demands of several labor-intensive film production projects in progress, and her other ongoing commitments, I doubt whether she will be able to complete the project in a timely manner or, I regret to say, at all. [Professor Joritz'] area of specialization is not my own, but as a published film/media historian whose research includes animation, I believe that presenting this book project as a sustainable major scholarly work is unrealistic and the candidate's research record warrants only 'Record not sufficient for progress to tenure.'" (Emphasis added.)

Because the IRC gave Joritz a favorable recommendation, the IRC's PTTR evaluation was forwarded to the CCAPT as required by the FMS Department's rules on Promotion and Tenure Procedure. And in accordance with the FMS Department rules, the FMS Chair's letter disagreeing with the IRC's recommendation of sufficient progress toward tenure was also forwarded to the CCAPT.

Eventually, as required by the College of Liberal Arts and Sciences' purpose statement, the Chair of the CCAPT sent the Dean of the College of Liberal Arts and Sciences a letter with the CCAPT's recommendation to terminate Joritz' tenure track

employment. Shortly thereafter, and also in accordance with the College of Liberal Arts and Sciences' purpose statement, the Dean sent a letter to the Interim Provost notifying her of the CCAPT's recommendation for nonreappointment. He also sent another letter to Joritz, which was mostly identical to the letter the CCAPT Chair suggested the Dean send to Joritz.

Importantly, although the Dean's letter to the Interim Provost summarized the CCAPT's findings, the Dean's letter to Joritz included a more detailed explanation of why the CCAPT recommended termination of her tenure track employment. In the Dean's letter to Joritz, he explained that Joritz' teaching record was "the strongest component of [her] dossier." After saying this, however, the Dean took issue with Joritz' service and research record. He alleged that Joritz' service record was "weakened by the repeated instances of dismissive, defensive and inappropriate behavior towards colleagues, staff, and [graduate teaching assistants]" as described in the FMS Chair's letter. As for Joritz' research record, the Dean told Joritz the following:

> "Your research record indicates serious deficits. Though you have recently presented two public presentations and a non-peer reviewed review of a museum exhibition, there was agreement among [the IRC, the FMS Chair], and CCAPT that, even with this recent activity, the quantity of your major works was not sufficient as evidence of progress to tenure. Moreover, the status of your proposed book on Lotte Reiniger is unclear. Given that you do not envisage completion of the project until 2019, and given the limited additional evidence of research productivity, CCAPT is very concerned about your lack of progress towards tenure."

In the Dean's letter, although he did not explicitly state what all of Joritz' concerns were, he also noted that he had spoken to Joritz about some concerns that she had with her PTTR. He explained that although Joritz had "raised a number of concerns with [him] (and several others), including that prejudicial statements were included in the [IRC] review," he alleged that Joritz' specific concerns had no bearing on the IRC's, the

11

CCAPT's, or his recommendation. In doing so, he stressed that the IRC "gave [her] a favorable recommendation." Additionally, he asserted that the "CCAPT did not have access to any information that stemmed from issues [Joritz] raised and the faculty member [Joritz] identified as biased was recused" from the CCAPT review.

Once the Interim Provost received the Dean's letter, she sent a letter to Joritz explaining that she agreed with the Dean's recommendation to terminate her tenure track employment because her service and research record were inadequate. In this letter, the Interim Provost also told Joritz that unless she appealed to the FRB, she was forwarding her recommendation to the Chancellor for final agency action.

Joritz exercised her right to appeal to the FRB. In her appeal, Joritz made numerous arguments about procedural violations that occurred at every level of her PTTR process. She also took issue with the FMS Chair's letter disagreeing with the IRC's finding that she had made sufficient progress toward tenure. In doing so, although she stressed that she had not yet received a copy of the FMS Chair's letter, Joritz alleged that it contained factually inaccurate information based on the content of the letters that she had received from the Dean and the Interim Provost. In particular, she took issue with the FMS Chair's assertion that G.M., the last living coworker of Reiniger, was senile. She alleged that this person was healthy and emphasized that she had already conducted hours of audio interviews with him. She further took issue with the FMS Chair's assertion that she had limited access to the museum in Germany containing important primary sources on Reiniger. As evidence that this assertion was false, she alleged that she had spoken to the museum's curator within the past week, who had told her that she could access "any materials [Joritz] may need from their archive."

Eventually, the FRB Chair wrote the Chancellor a letter explaining that the FRB found a single procedural violation during Joritz' PTTR process. She explained that contrary to the College of Liberal Arts and Sciences' PTTR purpose statement, the FMS

12

Chair did not meet with Joritz to discuss her PTTR evaluation after the Dean notified her of the CCAPT's recommendation of nonreappointment. But she further explained that the FRB did not believe that this procedural violation "significantly prejudiced Professor Joritz in the PTTR process." Relatedly, although she never alleged that the FMS Department violated its PTTR procedures, she suggested that the FMS Department amend its PTTR rules so that its Chair could no longer serve as a nonvoting member of the IRC to avoid the appearance of "a lack of independent judgment of the candidate's record."

Concerning Joritz' assertion that the FMS Chair's letter contained factually inaccurate information, the FRB Chair told the Chancellor that the FRB found that the following statements were incorrect: (1) the FMS Chair's statement that G.M. was "'lapsing into senility and ill health'" and (2) the FMS Chair's statement that "officials at the Stadtmuseum in Tubingen, Germany have denied Professor Joritz access to an archive of materials necessary to the completion of the project" on Reiniger. She also told the Chancellor that these factually inaccurate statements likely influenced the CCAPT's as well as the Dean's conclusion that the status of Joritz' proposed book on Reiniger remained unclear. As a result, the FRB recommended that the Chancellor disregard those statements in her "independent judgment of the [candidate's] record." For this same reason, the FRB Chair told the Chancellor that she should "take[] into account" the CCAPT's and the Dean's "mistaken reliance" on those factually inaccurate statements when considering whether Joritz' research record demonstrated sufficient progress toward tenure to continue her tenure-track employment.

Yet, except for the preceding problems, the FRB rejected Joritz' many arguments. The FRB chair told the Chancellor that outside from the issues outlined in her letter, the FRB found no violation of Joritz' faculty rights during her PTTR process.

13

A couple of days after the Chancellor received the FRB Chair's letter, the Interim Provost sent Joritz a letter stating that the Chancellor had decided to accept the recommendation for nonreappointment. Regarding the Chancellor's reason for terminating Joritz' tenure track employment, the Interim Provost provided the explanation below:

> "In my letter dated April 13, 2016, you were advised that [the Dean] had recommended that you be given notice of non-reappointment for the reasons stated in his April 8, 2016 letter to you, and that I concurred with his recommendation. You appealed the notice of non-reappointment to the [FRB], which recommended that the Chancellor disregard two statements contained in the Department [Chair's] letter and take into account the impact of those statements on the Dean's and CCAPT's recommendations in her independent review of your record. The recommendation for non-reappointment and letter from the FRB were forwarded to the Chancellor who, after careful review, has decided to accept the recommendation for non-reappointment. In doing so, the Chancellor determined that FRB went beyond its jurisdiction in its recommendation. Nonetheless, even excluding consideration of the information in the Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment."

*The District Court Denies Joritz' Petition for Review*

After the Chancellor decided to terminate Joritz' tenure track employment with the University, Joritz filed a petition for judicial review under the KJRA with the district court. As she did in her appeal to the FRB, in her petition, Joritz made numerous arguments about procedural violations occurring at every level of her PTTR process. She asserted that certain agency officials, including the FMS Chair, intentionally violated PTTR procedural rules so the University would terminate her tenure track employment. And she took issue with the fact that a professor who served on the IRC was also a member of the CCAPT.

14

Based on all this, Joritz argued that the University violated the KJRA in five ways when terminating her tenure track employment: (1) by erroneously interpreting the law contrary to K.S.A. 77-621(c)(4); (2) by failing to follow prescribed procedures contrary to K.S.A. 77-621(c)(5); (3) by allowing persons who should have been disqualified from membership of the CCAPT on this committee contrary to K.S.A. 77-621(c)(6); (4) by basing her termination on evidence that was not substantial when viewed in light of the record as a whole contrary to K.S.A. 77-621(c)(7); and (5) by terminating her in the first place as this decision was unreasonable, arbitrary, and capricious contrary to K.S.A. 77-621(c)(8). She then asked the district court to grant her the following relief: (1) to reinstate her tenure track employment with the University, (2) to reinstate the fellowship that she lost because of her termination and its corresponding $1,000 award, (3) to order the FMS Department to give her a semester without teaching classes to research Reiniger, (4) to order the University to give her another year to prepare for her next PTTR, (5) to order the University to allow her "the right to assemble impartial evaluators consisting of University faculty and administrators for her future evaluations"; and (6) to order the University to remove all "discriminatory, factually inaccurate, and libelous material" from her University employment record.

In its response, the University denied violating the KJRA when terminating Joritz' tenure track employment. In addition to largely denying the fact statements that Joritz had included in her petition, the University argued that many of Joritz' fact statements were irrelevant to deciding her specific KJRA claims. Likewise, it noted that Joritz devoted much of her facts section to legal arguments, which it would not respond to because those arguments should not have been included in her facts section. As a result, the University asked the district court to deny Joritz' petition and all of her requested relief.

Eventually, both parties filed briefs with the district court to support their respective positions. In her brief, Joritz largely repeated her complaints contained in her petition for review. Nevertheless, she also made a new argument. Although she did not

15

explain what provision the University relied on that was unconstitutional, in addition to her other KJRA claims, Joritz now argued that the University relied on an unconstitutional rule or statute when terminating her tenure track employment contrary to K.S.A. 77-621(c)(1). In its brief, the University countered that each of Joritz' arguments were meritless. It stressed that Joritz carried the burden of proof, and it stressed that the harmless error rule applies to lawsuits filed under the KJRA. It then argued that Joritz had failed to prove that the University or its officials committed any prejudicial error during her PTTR process during the 2015-2016 academic year. In making this argument, the University also argued that our Supreme Court's decision in *Harsay v. University of Kansas*, 308 Kan. 1371, 430 P.3d 30 (2018), supported the denial of Joritz' petition for judicial review.

After the parties briefed their respective positions, the district court held oral arguments. At oral arguments, the parties largely repeated the arguments made in their briefs. Yet, at this time, Joritz also took issue with the University's reliance on *Harsay* because *Harsay* involved a person who would have actually been awarded tenure had the University not terminated her tenure track employment.

In the end, however, the district court issued a memorandum decision denying Joritz' petition for judicial review. Even though Joritz argued that the *Harsay* decision was distinguishable from her case, the district court rejected this argument. It ruled that Joritz' specific complaint about *Harsay* involving a person who would have actually been awarded tenure did not mean the law within *Harsay* was inapplicable to her case. Afterwards, it made the following fact-findings: (1) that during her initial PTTR in the 2014-2015 academic year, Joritz had been warned that she needed to complete her major research projects at least a year before she applied for tenure, (2) that in her dossier for her second PTTR in the 2015-2016 academic year, Joritz had conceded that her Reiniger book would not be finished until 2019 and that *Film Feed* would not be finished until 2017, and (3) that from the agency record, nothing indicated that the Chancellor violated

16

any University rules or procedures when terminating Joritz' tenure track employment. Then, it ruled that Joritz had failed to establish that the University violated any provision of the KJRA in terminating her tenure track employment for the following reasons:

"There is no evidence to find that the agency action, or any regulation on which the agency acted is unconstitutional on its face or as applied to Professor Joritz as contemplated by K.S.A. 77-621(c)(1). Nor are there facts to find that [the University] erroneously interpreted or applied the law to support a violation under subsections (c)(4) or (5). To whatever degree any review board or committee did not conform to [University] policy, none of those bodies were the decision-makers so as to support a violation of K.S.A. 77-621(c)(6). As more fully discussed with regard to the analysis of subsection (c)(7), the evidence does not permit the conclusion that the agency action was otherwise unreasonable, arbitrary or capricious as prohibited by subsection (c)(8).

"The record reflects that [the Chancellor] provided a May 13, 2016, letter that set forth the basis for her decision—to include concurrence with the reasons articulated in her prior notice of non-reappointment—but stated her own, independent conclusion that reappointment was not warranted. A review of the record here provides substantial support, as set forth in [the fact-findings], that the process afforded Professor Joritz was sufficient to justify the decision. While this Court can and must defer to the established law that such decisions are imbued with a presumption of validity, the deficiencies recited above, considering the record as a whole, make clear that when [the Chancellor] references the inadequacy of [Professor] Joritz' research record reflected inadequate progress, the evidence exists to support this conclusion. Whether [Professor] Joritz agrees, or can convince others to agree, is no evidence that merits relief under the KJRA.

"At each stage of the review process, concerns were articulated as to the lack of sufficient research and scholarship—despite any aspirational comments in support of Professor Joritz' goals. The record as a whole reflects these recurring statements and, in fact, fair notice to Professor Joritz that these expectations existed and were in jeopardy of not being met. [Citations omitted.]"

Joritz timely appealed the denial of her petition for judicial review to this court.

17

*Did the District Court err by denying Joritz' petition for review?*

In her appellant's brief, Joritz makes numerous arguments why we should reverse the district court and grant her petition for judicial review. Even so, her arguments can be broken down into three broad categories: First, Joritz argues that the district judge who denied her petition for judicial review committed judicial misconduct when doing so. Second, Joritz argues that the district court made multiple legal errors when denying her petition for judicial review. Those errors include misapplying our Supreme Court's precedent in *Harsay* and misunderstanding its scope of review as stated under K.S.A. 77-621. Third, Joritz argues that the district court wrongly determined that the University's termination of her tenure track employment was supported by substantial evidence when viewed in light of the record as a whole as stated under K.S.A. 77-621(c)(7). In making this argument, Joritz' complaints focus on alleged inadequacies with the Chancellor's decision to terminate her tenure track employment with the University, which she says that the district court ignored.

The University counters that we should affirm the district court's denial of Joritz' petition for judicial review both because there are procedural problems with her arguments and because her arguments are groundless. The University starts its appellee's brief by pointing out that Joritz has raised many arguments in the facts section of her appellant's brief. In citing Kansas Supreme Court Rule 6.02(a)(4) (2021 Kan. S. Ct. R. 35), the University asks us to disregard all arguments that Joritz raised in her facts section. Next, it contends that each of Joritz' arguments about the district court committing judicial misconduct largely hinges on her misunderstanding of the applicable law. As for Joritz' other arguments, the University contends that Joritz has not met her burden of proving that it or its officials violated the KJRA during her second PTTR process and agency-level appeal so as to cause harm. As with Joritz' judicial misconduct

arguments, the University contends that Joritz' specific complaints about KJRA violations largely hinge on her misunderstanding of the applicable law.

In her reply brief, Joritz challenges the University's recitation of the facts, arguing that the University included many "false and/or misleading statements" in its appellee's brief. At the same time, she contends that we should apply the "pro se standard of review" to her appeal. According to Joritz, it would be unfair for us to ignore her arguments within her facts section because she is pro se. Citing federal caselaw, she asserts that under this pro se standard, "[p]ro se litigants' court submissions are to be construed liberally and held to less stringent standards than submissions of lawyers." Then, relying on this assertion, she contends that if we can reasonably understand her arguments, we should address each argument that she has included in her appellant's brief, no matter where she has included it in her appellant's brief.

1. *Joritz is not Entitled to Special Treatment because she is a Pro Se Appellant.*

Before turning to the specific problems with Joritz' chief arguments in her appellant's brief, we address the problematic arguments raised by Joritz in her reply brief. Most significantly, although Joritz asks us to use a special standard of review because she is pro se, Joritz is not entitled to special treatment as a pro se appellant. As just noted, in her reply brief, Joritz argues that pro se litigants' court submissions are to be construed liberally and held to less stringent standards than submissions of lawyers. To support this argument, Joritz cites only federal caselaw, which has held that pro se parties' pleadings are held to less stringent standards than formal pleadings drafted by lawyers. See *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007). She asserts that since she is pro se, it would be unfair for us to ignore some of her arguments because they are "inartfully drawn." So, Joritz wants us to liberally construe all her arguments *and* consider all of her arguments no matter where they are located in her appellant's brief.

19

Although Joritz candidly acknowledges that some of her arguments are "inartfully drawn," she fails to recognize that some of her arguments suffer from a glaring procedural problem. Her problem is that she failed to comply with the procedural rules allowing us to consider some of her arguments on appeal. And as stressed by the University, one of the more obvious procedural rules that Joritz has violated is Kansas Supreme Court Rule 6.02(a)(4). This rule explicitly states that an appellant's brief must contain "[a] concise but complete statement, *without argument*, of the facts that are material to determining the issues to be decided in the appeal." (Emphasis added.) Rule 6.02(a)(4) (2021 Kan. S. Ct. R. 36).

Under Kansas law, the pro se liberal construction rule does not mean that pro se litigants can ignore procedural requirements. Instead, "[w]hile pro se pleadings are to be liberally construed so that relief may be granted if warranted by the facts alleged, this simply means that the substance of the pleading controls over its label." *In re Estate of Broderick*, 34 Kan. App. 2d 695, 701, 125 P.3d 564 (2005). As a result, we have explained:

> "'A pro se litigant in a civil case is required to follow the same rules of procedure and evidence which are binding upon a litigant who is represented by counsel. Our legal system cannot function on any basis other than equal treatment of all litigants. To have different rules for different classes of litigants is untenable. A party in civil litigation cannot expect the trial judge or an attorney for the other party to advise him or her of the law or court rules, or to see that his or her case is properly presented to the court. A pro se litigant in a civil case cannot be given either an advantage or a disadvantage solely because of proceeding pro se.' *Mangiaracina v. Gutierrez*, 11 Kan. App. 2d 594, 595-96, 730 P.2d 1109 (1986)." 34 Kan. App. 2d at 701.

See also *Guillory v. State*, 285 Kan. 223, 229, 170 P.3d 403 (2007) (citing the preceding precedent with approval).

Joritz here argues otherwise. But she is not entitled to special treatment as a pro se litigant when it concerns her failure to follow procedural rules. While we should liberally construe her arguments when properly raised, we cannot address arguments that are not properly before us. See also K.S.A. 60-2101(a) (explaining this court's limited jurisdiction). Nor can we bolster arguments that are properly before us but inadequately briefed. See *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017) (holding that a point raised incidentally in a brief and not argued therein is inadequately briefed and thus waived and abandoned); see also *In re Adoption of T.M.M.H.*, 307 Kan. 902, Syl. ¶ 6, 416 P.3d 999 (2018) (holding that a point raised without pertinent authority or without analysis explaining why it is sound despite a lack of supporting authority is inadequately briefed and thus abandoned).

Also, we note that this is not the first time Joritz has asked a court to apply a special pro se standard of review. Highly summarized, Joritz sued the University as well as some of its officials in federal court, alleging that the University discriminated against her contrary to Title VII of the Civil Rights Act of 1964 when terminating her tenure track employment. Joritz eventually lost her lawsuit. But before she was denied relief, the federal district court issued two orders rejecting Joritz' request to treat her pleadings differently because she was pro se. See *Joritz v. University of Kansas*, No. 17-4002-SAC-JPO, 2020 WL 6286351, at \*3 (D. Kan. 2020); and *Joritz v. University of Kansas*, No. 17-4002-SAC-JPO, 2020 WL 5253396, at \*4 (D. Kan. 2020); see also *Joritz v. Gray-Little*, 822 Fed. Appx. 731 (10th Cir. 2020) (unpublished opinion). In the order issued by the federal district court about three months before Joritz filed her appellant's brief in this case, the court explicitly denied Joritz' request to ignore the University's persuasive claim preclusion argument because she was a pro se litigant. It explained it would not do so because "[t]he Tenth Circuit has stated over and again that while a court may liberally construe pro se filings, it must not assume the role of advocate or search the record and construct arguments for a pro se litigant." 2020 WL 6286351, at \*3.

So unlike many pro se appellants who may not fully realize the risks of representing themselves, Joritz knew about the risks of proceeding pro se. Despite knowing those risks, Joritz continued to represent herself in this appeal. Then, in addition to the Kansas caselaw barring Joritz' request to impose a special pro se standard of review, Joritz' arguments about using a special pro se standard of review are particularly unpersuasive since she knew that her pro se status entitled her only to the liberal construction of her arguments on filing her appellant's brief in this case.

In turn, it is readily apparent that Joritz' other reply brief arguments are also flawed. First, her pro se status does not allow her to ignore appellate procedures, including Rule 6.02(a)(4). Because Rule 6.02(a)(4) explicitly prohibits arguments in fact sections, there is no excuse for Joritz' failure to follow this rule. For this reason, we will not consider the approximately 10 arguments that Joritz has included in her facts section.

Next, in her reply brief, Joritz briefly contends that the University raised a new argument in its appellee's brief by pointing out her facts section's deficiencies. Based on this contention, she suggests that she is not raising a new argument in her reply brief by requesting a special pro se standard of review. Nevertheless, appellees may note procedural problems with the appellant's arguments. By doing this, appellees merely point out inadequacies with the appellant's arguments as included in the appellant's briefs. Also, if anything, it is Joritz who has raised a new argument in her reply brief by asserting that there is a pro se standard of review requiring us to ignore her failure to follow procedures. Hence, in addition to the other problematic arguments in her reply brief, Joritz' reply brief violates Kansas Supreme Court Rule 6.05 (2021 Kan. S. Ct. R. 37), which states that a reply brief may contain only arguments "made necessary by new material contained in the appellee's or cross-appellee's brief."

In summary, Joritz argues that we should use a special pro se standard of review where she is held to less stringent standards than lawyers when considering arguments on

appeal. Nevertheless, Kansas caselaw establishes that Joritz' pro se status entitles her only to the liberal construction of arguments that are properly before us. She cannot avoid complying with appellate procedure because she is pro se. If she were allowed to do so, she would gain an unfair advantage over the University since it relied on the procedural deficits in her appellant's brief when responding to her arguments in its appellee's brief. In addition, as stated previously, it is not our duty to unearth and then address all the various arguments that Joritz has included in impermissible places within her appellant's brief. See Rule 6.02(a)(1)(A), (5) (explaining that appellants must divide their arguments by issue with citation to the appropriate standard of review). Once again, "[j]udges are not like pigs, hunting for truffles buried in briefs." *Dunkel*, 927 F.2d at 956. Nor are they archeologists searching for buried treasure. *DeSilva*, 181 F.3d at 867. Hence, we hold three things: (1) that Joritz is not entitled to a special pro se standard of review, (2) that Joritz' facts section arguments are impermissible under Kansas Supreme Court Rule 6.02(a)(4), and (3) that Joritz' reply brief arguments are impermissible under Kansas Supreme Court Rule 6.05.

2. *Joritz' Underlying Arguments are Improperly Raised, Inadequately Briefed, or Baseless.*

Having established that Joritz is not entitled to the special treatment she has requested because of her pro se status, we will address Joritz' underlying arguments concerning whether the district court wrongly denied her petition for judicial review. Because Joritz is suing the University under the KJRA, K.S.A. 77-621 defines the scope of our review. K.S.A. 77-621(a)(1); see also K.S.A. 77-606 (stating that the KJRA is the exclusive means of judicial review of an agency action). Notably, when considering appeals under the KJRA, we exercise the same statutorily limited review of the disputed agency action as does the district court. *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). Also, in making

23

determinations under K.S.A. 77-621, all courts reviewing the disputed agency action must take "due account . . . of the rule of harmless error." K.S.A. 77-621(e).

Unless some provision says differently, parties challenging the agency action carry the burden of proving the invalidity of the disputed agency action. K.S.A. 77-621(a)(1). Subsection (c) of K.S.A. 77-621 lists the limited circumstances in which courts may grant relief to parties under the KJRA. In relevant part, K.S.A. 77-621(c) states:

> "The court shall grant relief only if it determines any one or more of the following:
> (1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;
> . . . .
> (4) the agency has erroneously interpreted or applied the law;
> (5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> (6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;
> (7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or
> (8) the agency action is otherwise unreasonable, arbitrary or capricious."

When considering whether disputed agency actions were supported by evidence that was substantial "in light of the record as a whole" as stated under K.S.A. 77-621(c)(7), the phrase "'in light of the record as a whole'" means:

> "[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in

24

the record, compiled pursuant to K.S.A. 77-620 [the provision controlling agency records], and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. *In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review*." K.S.A. 77-621(d). (Emphasis added.)

And when considering whether disputed agency actions were "unreasonable, arbitrary or capricious" as stated under K.S.A. 77-621(c)(8), the phrase "unreasonable, arbitrary or capricious" concerns whether the agency action was justified. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 569, 232 P.3d 856 (2010).

Thus, in this appeal, Joritz carries the burden of proving that the district court wrongly denied her petition for judicial review because the University's disputed actions during her second PTTR and agency-level appeal constituted impermissible agency actions under K.S.A. 77-621(c) that caused actual harm during those proceedings.

a. *Judicial Misconduct Arguments*

For Joritz' judicial misconduct arguments, her main complaint on appeal is that the district judge who considered her petition for review committed misconduct by "basing its ruling on false, fabricated facts, distorted facts, misleading statements and material misrepresentations" when it made certain fact-findings while denying her petition for review. She then dissects the district judge's fact-findings, making approximately 18 arguments why the district judge falsified, misrepresented, or omitted certain facts from his fact-findings when denying her petition for review. Overall, Joritz' judicial misconduct complaints focus on her belief that the district judge ignored the evidence that she presented proving that the University violated its PTTR procedures because he was biased in favor of the University.

25

In making her judicial misconduct claim, Joritz merely alleges that the district judge was biased in favor of the University without presenting any analysis of why the district judge would be biased. Yet, what we expect from Joritz' argument are reasons for believing the district judge committed judicial misconduct. Indeed, we expect independent evidence for the claim made in her conclusion and in her premise. Joritz' argument presupposes what she endeavors to prove, namely, that the district judge was biased in favor of the University. This is what is being begged. Nevertheless, this is something, of course, that Joritz should prove:  that the district judge was biased in favor of the University. Joritz' claim, however, is entirely unsupported in her brief. So Joritz' argument assumes just what she needed to prove.

Appellants do not meet their burden of establishing error on appeal by making conclusory contentions without any analysis, let alone evidence, to support their claims. *RAMA Operating Co. v. Barker*, 47 Kan. App. 2d 1020, 1031, 286 P.3d 1138 (2012). It follows that, by making conclusory contentions on appeal, appellants necessarily raise their arguments incidentally in their briefs, which results in abandonment of their arguments. 47 Kan. App. 2d 1020, Syl. ¶ 14. Plainly, because Joritz provides no analysis or evidence why the district court was biased in favor of the University, Joritz' judicial misconduct arguments are fatally flawed. Simply put, Joritz' misconduct claims against the district judge, as well as most of her complaints against University officials involved in her termination, are actually unsupported ad hominem attacks on their personal character that do not address why the district court affirmed the University's termination of her tenure track employment.

Notwithstanding the preceding, Joritz cannot establish that the district court committed misconduct just because she disagrees with the district court's fact-findings against her. For example, many of Joritz' judicial misconduct complaints involve her belief that the district court somehow acted inappropriately by finding that her research record contained deficits because, by her own admission, she would not complete her

26

Reiniger book until 2019 and her *Film Feed* project until 2017. In making these misconduct complaints, Joritz tries to pick apart this finding (1) because she may have completed those projects before her mandatory tenure review year and (2) because completion of those projects was not a requirement of her second PTTR during the 2015-2016 academic year. But Joritz' arguments misrepresent the district court's fact-findings and the record on appeal.

Joritz never clearly explained when her mandatory tenure review year was in her petition for judicial review. Instead, her petition implied that her mandatory tenure review year would have been three years after her second PTTR during the 2015-2016 academic school year, which would have been sometime during the 2018-2019 academic school year. And her complaints either ignore or misrepresent the evidence that the district court relied on in making the disputed fact-finding. The Dean's letter to Joritz following the CCAPT's review of Joritz' initial PTTR by the FMS Department, explicitly told Joritz that it was important for her to complete her ongoing research projects "in time for juried exhibition and peer evaluation at least one year in advance of [Joritz'] mandatory tenure review," that is, at least one year before 2019 at the latest. Yet, in her dossier for her second PTTR during the 2015-2016 academic school year, Joritz explicitly stated that her projected completion of her book on Reiniger was 2019 and her projected finish for the movie *Film Feed* was 2017.

In short, a review of some of Joritz' judicial misconduct arguments supports that Joritz has misrepresented the district judge's fact-findings, as well as the record before the district judge, to support her misconduct arguments. Although Joritz may disagree with the district court's fact-findings against her, her disagreement with those fact-findings or the omission of other fact-findings does not mean that the district court engaged in misconduct. Additionally, Joritz' failure to cite any authority supporting her allegation of judicial misconduct—based on her disagreement with the district judge's fact-findings—

27

shows she has inadequately briefed her judicial misconduct argument. This failure is akin to abandoning her argument. See *Russell*, 306 Kan. at 1089.

Most importantly, though, Joritz never argued that the district judge committed misconduct below. Instead, as stressed by the University, she has raised this argument for the first time on appeal.

Generally, we do not consider issues raised by appellants for the first time on appeal. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 801, 466 P.3d 1207 (2020). This includes when appellants have argued that the district judge engaged in judicial misconduct for the first time on appeal. See *State v. Jones*, 273 Kan. 756, 787, 47 P.3d 783 (2002); *Bohanon v. Werholtz*, No. 104,490, 2011 WL 2135163, at *4 (Kan. App. 2011) (unpublished opinion). Also, although there are a few exceptions to this general rule, our Supreme Court has held that appellants must invoke one of those exceptions since Kansas Supreme Court Rule 6.02(a)(5) requires appellants to explain why an issue not raised below should be considered for the first time on appeal. The court has further warned that appellants who violate this rule risk a ruling that their arguments are inadequately briefed and thus waived and abandoned. *In re Adoption of Baby Girl G.*, 311 Kan. 802-03.

In conclusion, although Joritz has spent the bulk of her appellant's brief arguing that the district judge committed misconduct when denying her petition for judicial review, Joritz has waived and abandoned all her judicial misconduct arguments by failing to adequately brief those arguments.

### b. *Legal Error Arguments*

As for Joritz' legal error arguments, throughout her appellant's brief, Joritz argues that the district court made many legal errors when denying her petition for judicial

28

review. Even so, her chief legal arguments are as follows: (1) that the district court wrongly relied on our Supreme Court's precedent in *Harsay*, (2) that the district court wrongly limited its review to evidence that only supported the University's termination of her tenure track employment, and (3) that the district court wrongly limited its review to the Chancellor's decision to terminate her tenure track employment. A review of Joritz' arguments as compared to the district court's memorandum decision denying her petition shows that each of Joritz' legal error arguments are unfounded.

Joritz arguments about the district court's reliance on *Harsay* concerns the district court's discussion of the applicable standard of review in its memorandum decision. She asserts that the district court's reliance on *Harsay* was misplaced because she is appealing from her termination following an unsuccessful PTTR while Harsay was appealing from her termination following an unsuccessful final tenure review. She also takes issue with the district court's finding that if there was a distinction between her case and *Harsay*, the distinction was that "'tenure [was] a decision that justifies greater court scrutiny than the tenure track decision simply because the tenure candidate has invested more time and effort in the ultimate decision under review.'" Of note, in making this argument, Joritz further argues that the district court's misapplication of our Supreme Court's precedent in *Harsay* violated her due process rights under the Fifth and Fourteenth Amendments to the United States Constitution.

In its entirety, the district court's standard of review discussion within its memorandum decision stated:

> "The decision under review is one that involves a great deal of particular experience and judgment by persons familiar with the caliber and nature of the skills, expertise and qualities required of a University of Kansas Professor. It is the product of input from numerous colleagues, review committees and, ultimately, the Chancellor. In that way, it is distinct from fact determinations of the kind involved in inherently more objective decisions such as disability determinations, *Herrera-Gallegos v. H&H Delivery*

29

Service[], *Inc.*, 42 Kan. App. 2d 360[, 212 P.3d 239] (2009)[,] or a Board of Tax Appeals [decision] considering classification or valuation of land, *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105[, 269 P.3d 876] (2012).

"For that reason, the standard of 'substantial competent evidence' that must exist to support a decision such as that under consideration here is most appropriately stated in *Harsay* . . . . The decision of whether to grant tenure, or whether to continue someone on the track towards tenure, are both very much matters of 'business judgment' that a court should not disturb by substituting its judgment for that of the [U]niversity.

"Professor Joritz disputes the application of this conclusion from *Harsay* to her case because the issue is not tenure but the continued path towards tenure. One could say this is a distinction without a difference. Yet, one difference that arguably exists would be this: [T]enure is a decision that justifies greater court scrutiny than the tenure track decision simply because the tenure candidate has invested more time and effort in the ultimate decision under review.

"The Court is unpersuaded that a distinction exists. And, in any event, [the University] need only show that there is substantial competent evidence to support its decision. This determination by the court must be based in light of the record as a whole. That Professor Joritz can make a strong case for a different conclusion does nothing to affect the outcome given the deference this Court must extend if that substantial evidence burden is met."

Although Joritz argues that the district court's reliance on *Harsay* was misplaced since she and Harsay were terminated at different times during their tenure track employment, the district court correctly found that Joritz' complaint involved a distinction without a difference. As explained when outlining our scope of review, parties seeking judicial review of an agency action must sue under the KJRA, and K.S.A. 77-621 defines the scope of review for all courts reviewing agency actions. It therefore follows that the same standard of review that applied in Harsay's lawsuit against the University applies in Joritz' lawsuit against the University. And, indeed, the *Harsay* court considered Harsay's specific complaints under K.S.A. 77-621(c)'s limited scope of review. 308 Kan. at 1382-85. On top of this, the district court's standard of review discussion was consistent with our Supreme Court's *Harsay* decision, which held: (1) that the substantial

competent evidence burden of proof was "essentially equivalent" to evidence that is substantial in light of the record as a whole as meant under K.S.A. 77-621(c)(7) and (2) that University tenure decisions are based partly on the University's subjective "business judgment." 308 Kan. at 1382-83. And the district court, like us, was duty-bound to follow our Supreme Court's precedent. *Farmers Bank & Trust v. Homestead Community Development*, 58 Kan. App. 2d 877, 897, 476 P.3d 1 (2020) (holding that lower courts are duty-bound to follow our Supreme Court's precedent absent some indication that our Supreme Court is moving away from such precedent).

Besides, Joritz' entire argument about the district court's reliance on *Harsay* ignores that the district court also ruled that substantial evidence supported the University's termination of Joritz' tenure track employment regardless of the *Harsay* precedent. It explained that even disregarding the *Harsay* precedent, Joritz was not entitled to the relief she requested because substantial evidence in light of the record as a whole supported the University's termination of her tenure track employment. Thus, Joritz' specific complaints about the district court's reliance on *Harsay* are rendered irrelevant by her failure to address the district court's alternative ruling about substantial evidence supporting the University's termination of her tenure track employment. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (holding that issues not briefed by appellants are deemed waived and abandoned).

Next, Joritz' argument that the district court wrongly limited its review to evidence that only supported the University's termination of her tenure track employment is similarly unpersuasive. Although her argument is not entirely clear, Joritz seemingly contends that the district court's comparison of the substantial evidence standard to a business judgment proves that it wrongly limited its review of the record to only evidence that supported the University. But as just noted, the *Harsay* court held that University tenure decisions are based partly on the University's subjective "business judgment." 308 Kan. at 1383. Also, nothing within the district court's memorandum decision supports

that it refused to consider evidence supporting Joritz' KJRA claims. On top of this, it appears that Joritz has merely misunderstood the district court's discussion about reviewing agency actions for substantial evidence in light of the record as a whole. In its standard of review discussion, the district court never implied that it would review the evidence only supporting the University's termination of her tenure track employment. Instead, consistent with K.S.A. 77-621(d)'s rule barring courts from "reweigh[ing] the evidence or engag[ing] in de novo review" when considering whether substantial evidence in light of the whole supported the agency's disputed action, it explained it would not "substitut[e] its judgment for that of the University['s]" during its review.

Likewise, Joritz has also misunderstood the district court in arguing that the district court wrongly limited its review to the Chancellor's decision to terminate her tenure track employment with the University. She challenges the district court's ruling that "[t]o whatever degree any review board or committee did not conform with [University] policy" during her second PTTR and ensuing agency-level appeal, "none of those bodies were the decision-makers so as to support a violation of K.S.A. 77-621(c)(6)." She seemingly contends that because the FMS Chair, the Dean, the Provost, the IRC, the CCAPT, and the FRB all acted on behalf of the University, the University violated K.S.A. 77-621(c)(6)'s rule barring persons without authority from taking agency action.

Yet, when it pointed out that any review board or committee was not the decision maker to support a violation of K.S.A. 77-621(c)(6), the district court was simply explaining that any error that occurred during Joritz' second PTTR or earlier stage of Joritz' agency-level appeal was harmless because it was the Chancellor who took the final agency action on the University's behalf. Then, immediately after the district court made the disputed ruling, it rejected Joritz' argument about substantial evidence in light of the record as a whole not supporting the University's termination of her tenure track employment since the record showed two things:  (1) that the Chancellor recognized the

32

potential impact of the FMS Chair's inaccurate statements when engaging in her independent review and (2) that Joritz' research record was inadequate.

As a result, despite Joritz' arguments otherwise, nothing supports that the district court made multiple legal errors when denying her petition for judicial review.

c. *Factual Error Argument*

In Joritz' factual error argument, Joritz takes issue with evidence that the district court purportedly ignored when denying her petition for judicial review. According to Joritz, the Chancellor's decision to terminate her tenure track employment with the University could not have been supported by substantial evidence in light of the record as a whole as required under K.S.A. 77-621(c)(7) because the FMS Chair's factually inaccurate statements prejudiced her second PTTR process and her agency-level appeal. But there are a couple of problems with Joritz' argument.

As just noted, in denying Joritz' petition for judicial review, the district court implicitly ruled that any error occurring during Joritz' second PTTR and agency-level appeal was harmless because the Chancellor—the final agency actor on the University's behalf—explicitly recognized the potential impact of the FMS Chair's inaccurate statements when terminating Joritz' tenure track employment. Stated another way, the district court effectively determined that the FMS Chair's factually inaccurate statements did not prejudice Joritz because the Chancellor had adequately considered the impact of the FMS Chair's disputed statements during her independent review.

Yet, in her appellant's brief, Joritz never addresses the actual reason why the district court affirmed the University's termination of her tenure track employment. Instead, she has created and then knocked down her own strawman argument that hinges on asserting that the district court ignored critical evidence, without proving that the

33

evidence was, in fact, ignored. As a result, Joritz has abandoned her ability to argue that the district court wrongly ruled that substantial evidence in light of the record as a whole supported the University's decision to terminate her tenure track employment. See *In re Marriage of Williams*, 307 Kan. at 977 (holding that issues not briefed by appellants are deemed waived and abandoned).

Also, even if Joritz had not abandoned this argument, the district court's ruling was consistent with the applicable law and record before it. Again, under K.S.A. 77-621(e), all courts reviewing the validity of agency actions under the KJRA must take "due account . . . of the rule of harmless error." Additionally, in the Interim Provost's letter to Joritz outlining the Chancellor's reason for terminating her tenure track employment with the University, the Interim Provost explained that "even excluding consideration of the information in the [FMS] Chair's letter, the Chancellor determined that your research record demonstrated insufficient progress toward tenure, warranting non-reappointment."

So Joritz' factual error argument is unpersuasive for two reasons: (1) because she has abandoned it by failing to address the district court's harmless error argument and (2) because the record definitively establishes that the Chancellor did not ignore the potential impact of the FMS Chair's factually inaccurate statements during her second PTTR and agency-level appeal.

CONCLUSION

To conclude, although Joritz asks us to consider her arguments under a special pro se standard of review, Kansas caselaw establishes that pro se appellants must comply with all procedural rules regardless of their pro se status. Appellants like Joritz cannot rely on their pro se status to violate court procedural rules. It is not our job to dig for Joritz' arguments or to address Joritz' improperly briefed arguments. As a result, when it

34

comes to procedure, Joritz is not entitled to any liberal application of our procedural rules.

Under this proper standard of review, Joritz has waived and abandoned her judicial misconduct arguments by failing to adequately brief those arguments. In addition to some procedural problems with her legal error arguments, the record on appeal does not support Joritz' arguments about the district court making legal errors. It is also clear that Joritz has abandoned her argument that the district court wrongly determined that substantial evidence in light of the record of the whole supported the University's termination of her tenure track employment by ignoring critical evidence. The district court's memorandum decision disproves Joritz' contention that the district court ignored any critical evidence.

For these reasons, we affirm the district court's denial of Joritz' petition for judicial review.

Affirmed.